**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

v.                                                                    5:25-cr-94 (BKS/TWD)

JONAS MORALES-LOPEZ,

                              Defendant.

---

**Appearances:**

*For the United States of America:*
John A. Sarcone III
United States Attorney
Michael F. Perry
Assistant United States Attorney
100 South Clinton Street
Syracuse, New York 13261

*For Defendant Jonas Morales-Lopez:*
Lisa A. Peebles
Federal Public Defender
Gabrielle DiBella
Assistant Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, New York 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.      **INTRODUCTION**

        Defendant Jonas Morales-Lopez is charged with illegal reentry into the United States in

violation of 8 U.S.C. § 1326(a). (Dkt. No. 1). Defendant contends that he was illegally seized

and moves to suppress "all of the evidence and statements that were obtained as a result of the

illegal seizure." (Dkt. No. 23-1, at 16). The motion is fully briefed. (Dkt. Nos. 23-1, 36, 38). For

the reasons that follow, Defendant's motion to suppress is denied.

## II.     FACTS

Defendant has submitted an affidavit stating that on February 28, 2025, he drove to his home in Fulton, New York after working his usual night shift at a bakery. (Dkt. No. 23-2, ¶¶ 4–5). At approximately 8:50 AM, Defendant pulled into his driveway and an unmarked black SUV parked directly behind him. (*Id.* ¶¶ 6–7). A man in plain clothes, later identified as Homeland Security Investigations Special Agent Michael J. Ball, got out of the SUV and approached Defendant as he was gathering his belongings out of his car and walking to his residence. (*Id.* ¶¶ 6–8; Dkt. No. 36-1, ¶¶ 1–4). The encounter was recorded by Special Agent Ball's body cam, and the Defendant submitted the recording to the Court. (Dkt. No. 25).

The recording reflects the following. Upon approach, Special Agent Ball said in English, "I'm with immigration. Do you have any identification on you?" (*Id.*, 0:00:32–34). Defendant did not answer, and began to walk away towards his house. (*Id.*, 0:00:35–38). Special Agent Ball said in English, "Hold on, where you going, buddy?" (*Id.*, 0:00:37–38). Defendant said something in Spanish while taking a few more steps towards the house, when Special Agent Ball grabbed Defendant's arm and said in English, "Hey, hey, hey, hey. You're not free to go." (*Id.*, 0:00:38–42). Special Agent Ball directed Defendant to put his belongings on top of the car and again asked in English for identification. (*Id.*, 0:00:42–46). Defendant showed his Guatemalan Consular Identification Card, and Special Agent Ball asked in English if Defendant had "any US identification" on him. (*Id.*, 0:01:05–13). When Defendant did not respond, Special Agent Ball asked if Defendant spoke any English and Defendant responded, "a little." (*Id.*, 0:01:13–18). Special Agent Ball then repeated his request for US identification. (*Id.*, 0:01:19–21). Defendant indicated he had US identification in the house. (*Id.*, 0:01:22–26). Special Agent Ball asked if Defendant had a driver's license, and he said no even though he admitted he was just driving. (*Id.*, 0:01:27–33). Special Agent Ball asked if the car belonged to the Defendant, and Defendant

informed him that it was his brother's car. (*Id.*, 0:01:33–37). Special Agent Ball asked where Defendant was coming from, and Defendant answered that he was coming from work. (*Id.*, 0:01:38–56). Defendant states that he "struggled to understand" Special Agent Ball. (Dkt. No. 23-2, ¶ 13).

A Border Patrol SUV then pulled into the street and "parked in a manner that blocked all of the cars in the driveway." (*Id.* ¶ 14). Border Patrol Agent Ian Brockaway, wearing plain clothes, and Supervisory Border Patrol Agent Edgar Lorenzo, wearing a Border Patrol federal agent uniform, approached Defendant. (Dkt. No. 25, 0:02:07–33; Dkt. No. 23-3, at 9). Agent Brockway and Supervisory Agent Lorenzo spoke with Defendant in Spanish. (Dkt. No. 25, 0:02:07–57). In Spanish, Supervisory Agent Lorenzo asked Defendant if he had documents allowing him to be present in the United States legally and Defendant responded that he did not. (*Id.*, 0:02:43–46; Dkt. No. 23-2, ¶ 17). Supervisory Agent Lorenzo frisked Defendant, handcuffed him, put him in the Border Patrol SUV, and took him to a police station. (Dkt. No. 25, 0:04:07–06:32; Dkt. No. 23-2, ¶¶ 20–21).[1]

## III.    DISCUSSION

Defendant moves to suppress "all evidence and statements that flowed from [the unconstitutional seizure], including any information obtained by officers at the Syracuse federal courthouse on March 5, 2025." (Dkt. No. 23-1, at 9). The Government opposes Defendant's

---

[1] Defendant states that after he was read his rights at the police station, he "told the agents [he] did not want to answer questions without a lawyer present," but the agents ignored him and continued to ask him questions "for approximately a half an hour or forty-five minutes," and pressured him for the passcode to his phone. (Dkt. No. 23-1, at ¶¶ 23–31). The Government has not responded to these allegations. (*See generally* Dkt. No. 36). The Government, however, "does not intend to introduce in its case-in-chief at trial" any statements made by Defendant at the police station or any evidence obtained from the Defendant's cell phone, (*id.* at 6), and therefore, the Court does not address this evidence at this time.

motion and seeks to introduce "Defendant's identity, immigration history, and fingerprints."
(Dkt. No. 36, at 1).

In general, the Fourth Amendment prohibits unreasonable seizures. U.S. CONST. amend.
IV. "[I]t is uncontroversial that the Fourth Amendment applies to aliens and citizens alike."
*Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013). On a motion to suppress, a defendant
bears the initial burden of establishing that he was subjected to a warrantless search or seizure.
*United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citing *United States v.
Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980)). Once the defendant has met that burden, the burden
shifts to the Government to demonstrate by a preponderance of the evidence that the challenged
search or seizure did not violate the Fourth Amendment. *See United States v. Murphy*, 778 F.
Supp. 2d 237, 240 (N.D.N.Y. 2011) (citing *Arboleda*, 633 F.2d at 989), *aff'd*, 703 F.3d 182 (2d
Cir. 2012).

### A.    Seizure

The Court must first determine whether the Defendant was seized within the meaning of
the Fourth Amendment. The Government concedes that Defendant was seized when Special
Agent Ball grabbed Defendant's arm and told him he was not free to go. (Dkt. No. 36, at 6).
Accordingly, the critical question is whether Defendant was seized prior to that moment.
Defendant contends that he was seized when "Ball parked behind Jonas [Defendant] in his
driveway, so Jonas could not get back into the car and drive away" and then "approached Jonas
on foot and stood very close to him" such that "Jonas was not free to leave" "throughout the
entire encounter." (Dkt. No. 23-1, at 10; Dkt. No. 38, at 3). The Government argues that the

encounter was "consensual" until Special Agent Ball grabbed Defendant's arm and told him that he was not free to leave. (Dkt. No. 36, at 5).[2]

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quotation marks and citation omitted). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). In analyzing whether a seizure has occurred, the Second Circuit has identified the following factors as "pertinent":

> the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Brown v. City of Oneonta*, 221 F.3d 329, 340 (2d Cir. 1999).

Here, Special Agent Ball approached Defendant and began asking questions. Defendant clearly felt free to disregard him and go about his business, because he finished gathering his items out of his car, turned his back to Special Agent Ball, and began walking towards his house. Applying the *Brown* factors, at the beginning of the interaction, Special Agent Ball was the only officer and he did not display a weapon or touch Defendant. He identified himself and asked for

---

[2] The Government also argues that "Defendant effectively concedes that the encounter was consensual up to this point" because he did not "put forth any facts or specific arguments claiming that the (brief) pre-seizure portion of the encounter was anything but consensual." (Dkt. No. 36, at 5–6). The Court disagrees. Defendant argues that he "was seized for Fourth Amendment purposes within the first thirty seconds of the encounter, before any questions were asked or any evidence was seized" and points to the fact that "Ball parked behind Jonas in his driveway, so Jonas could not get back into the car and drive away" and then "approached Jonas on foot and stood very close to him." (Dkt. No. 23-1, at 10).

identification but did not demand identification or yell at Defendant. *Cf. Almeida-Amaral v. Gonzales*, 461 F.3d 231, 235 n.2 (2d Cir. 2006) ("[A] simple request for identification may not, without more, constitute a seizure, [but] a yelled command from a border agent might[.]" (citation omitted)). In the beginning of the interaction, Special Agent Ball was not in possession of Defendant's personal effects nor did he ask Defendant to accompany him anywhere. Merely parking behind Defendant and approaching him, as the Defendant was gathering his belongings from the car and walking toward his residence, did not constitute a seizure. *Cf. Lilly v. Town of Lewiston*, 449 F. Supp. 3d 190, 200 (W.D.N.Y. 2020) (finding Plaintiff plausibly alleged he was seized where his "vehicle was blocked by [the officer's] at a 90 degree angle, thus boxing him into the parking spot with a steep embankment behind him, and that [the officer] remained in this position for 10–15 minutes"); *Pane v. Gramaglia*, 509 F. App'x 101, 103 (2d Cir. 2013) ("[A] reasonable police officer would have known from established precedent that having a fellow officer pull a marked police car with activated turret lights behind [plaintiff's] parked car, thereby effectively blocking her movement, and directing the vehicle's spot light toward the interior of [plaintiff's] vehicle constituted a seizure that required reasonable suspicion."). On these facts, the Court finds that Defendant was not seized until Special Agent Ball grabbed his arm and told him he was not free to leave. Accordingly, the Court denies Plaintiff's motion to suppress evidence obtained before Special Agent Ball grabbed Defendant's arm and told him that he was not free to leave.

**B.    Reasonable Suspicion or Probable Cause**

The next question, then, is whether Special Agent Ball had the requisite level of suspicion to seize the Defendant at the moment that he grabbed Defendant's arm and told him he was not free to leave. There are two kinds of seizures: (1) brief, investigatory detentions often referred to as *Terry* stops, which require reasonable suspicion and (2) arrests, which require a showing of

probable cause or a warrant. *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995); *United States v. Patterson*, 25 F.4th 123, 135 (2d Cir. 2022). Defendant argues that a warrant and/or probable cause was required, but that Special Agent Ball acted without even the lower standard of reasonable suspicion such that "under any standard, the seizure violated the Fourth Amendment." (Dkt. No. 23-1, at 11). The Government does not address whether Special Agent Ball had reasonable suspicion or probable cause, (*see* Dkt. No. 36); instead, the Government states that it does not intend to introduce in its case-in-chief at trial "body cam footage of the seizure or afterward [nor] any statements the Defendant made after the seizure on the driveway or elsewhere," (*id.* at 6). Defendant argues that the Government has thereby "conceded that Ball did not have reasonable suspicion to seize Jonas." (Dkt. No. 38, at 5). Indeed, "a party may be deemed to have conceded an argument by failing to address it in its briefing." *CVS Pharm., Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 383 (S.D.N.Y. 2019).[3] Accordingly, the Court finds that the seizure was not supported by reasonable suspicion or probable cause.

### C.    Suppression

"To enforce the Fourth Amendment's prohibition against 'unreasonable searches and seizures,' [the Supreme Court] has at times required courts to exclude evidence obtained by unconstitutional police conduct." *Utah v. Strieff*, 579 U.S. 232, 234–35 (2016). "[T]he exclusionary rule is a judicially-created mechanism of safeguarding against unreasonable

---

[3] The Court notes that the record does not reflect reasonable suspicion to seize Defendant. Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch,'" and "due weight must be given . . . to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27. Here, Special Agent Ball stated in a declaration that immigration officials "received information that the registered owner" of the vehicle Defendant was driving was "an undocumented alien," (Dkt. No. 36-1, ¶ 2), without providing any further explanation of what information was received or how it was "received." Defense counsel documented two different explanations provided by other Government officials: (1) Defendant "was understood to be in the country illegally and with a criminal record, so HSI and Border Patrol went to find him at the address on file for him," (Dkt. No. 38-1, at 5); and (2) the agents "located Morales-Lopez in a vehicle and conducted a traffic stop; he ended up stopping in the driveway of his residence," (*id.*) As Defendant argues, there is nothing in the record supporting either of these explanations. (Dkt. No. 38, at 6–7).

searches and seizures — violations of the Fourth Amendment — primarily through its deterrent effect." *United States v. Hightower*, 950 F.3d 33, 36 (2d Cir. 2020). Defendant argues here that "[s]uppression of evidence through the exclusionary rule is the appropriate remedy for the Fourth Amendment violation in this case." (Dkt. No. 23-1, at 14). The Government argues that "Defendant's identity, immigration history, and fingerprints" are not suppressible. (Dkt. No. 36, at 7).

In general, "the exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *Strieff*, 579 U.S. at 237 (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). However, "the significant costs" of the exclusionary rule mandate that the rule only apply "where its deterrence benefits outweigh its substantial social costs" such that suppression is a "last resort" and not a "first impulse." *Id.* at 237–38 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). For the rule to apply, the police must have "violated the Constitution deliberately, recklessly, or with gross negligence" or the violation must be "the product of recurring or systemic negligence." *United States v. Smith*, 967 F.3d 198, 211 (2d Cir. 2020). The rule does not apply to "constitutional violations that are the product of isolated simple negligence, because exclusion in such circumstances will not result in appreciable deterrence of police misconduct." *Id.* at 211–12.

Here, the Government argues, (Dkt. No. 36, at 8), that the exclusionary rule does not apply to identity evidence, relying on a Supreme Court holding in a civil deportation case that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984).

However, the Second Circuit has since clarified that nevertheless, "in a civil proceeding," exclusion of evidence is appropriate, *inter alia*, if record evidence establishes "that an egregious violation that was fundamentally unfair had occurred." *Almeida-Amaral*, 461 F.3d at 234–35. The Second Circuit has also explained though that "*Lopez-Mendoza* reaffirmed a long-standing rule of personal jurisdiction; it did not create an evidentiary rule insulating specific pieces of identity-related evidence from suppression." *Pretzantzin v. Holder*, 725 F.3d 161, 166 (2d Cir. 2013).

The Government argues that the egregiousness exception is "unwarranted" and that "the Defendant's identity, pre-existing immigration file, and USMS fingerprints taken routinely at booking should not be suppressed under *Lopez-Mendoza* and *Almeida-Amaral*." (Dkt. No. 36, at 9–10). Defendant responds that the "egregious" standard only applies in the civil deportation context, and that in the criminal context, "the court considers suppression of identity-related evidence under the same standard applied to any evidence." (Dkt. No. 38, at 11). The Court agrees with Defendant that the egregiousness standard does not apply here, and instead considers whether suppression is proper under the standard generally applied in criminal cases. *See United States v. Olivares-Rangel*, 458 F.3d 1104, 1112 (10th Cir. 2006) ("[T]he 'identity' language in *Lopez-Mendoza* . . . does not apply to evidentiary issues pertaining to the admissibility of evidence obtained as a result of an illegal arrest and challenged in a criminal proceeding. Instead, we utilize the normal and generally applicable Fourth Amendment exclusionary rule to determine whether challenged identity-related evidence should be excluded under the circumstances present in the particular case.").

Defendant argues that "the violation was deliberate, reckless, or grossly negligent, and appears to be part of a nationwide trend" of "alleged Fourth Amendment violations by Border

Patrol and ICE." (Dkt. No. 23-1, at 15 (citing news articles)). The Government does not respond to Defendant's argument explicitly or with reference to the deliberate, reckless, or gross negligence standard, but does argue that the "agent understandably, though mistakenly, believed that the Defendant was the undocumented immigrant who owned the sedan he was driving, and the agent's seizure of the Defendant was peaceful and not egregious or fundamentally unfair." (Dkt. No. 36, at 9). However, there is conflicting evidence in the record in this case regarding the basis for the seizure, the information provided by the Government regarding the seizure was sparse, and the Government failed to provide any information about the source of the information received or advance any argument in support of reasonable suspicion. Plus, Defendant alleges—and the Government does not contest—that after his unlawful seizure, he was taken to a police station and put in a room with agents who "ignored" Defendant's statement that he did not want to answer questions without a lawyer present and continued to ask him questions for approximately thirty to forty-five minutes. (Dkt. No. 23-2, ¶¶ 21–34). On these facts, the Court finds that the violation was deliberate, reckless, or grossly negligent. *Cf. Smith*, 967 F.3d at 212 (finding isolated negligence where the officer's actions did not afford the police any strategic advantage and there were no facts showing systemic or recurring negligence by the officer or any of the investigative agencies involved).

The Government contends that regardless, suppression is improper because if released, the Court would be enabling Defendant to "continue in the commission of an ongoing crime." (Dkt. No. 36, at 11 (quoting *Lopez-Mendoza*, 468 U.S. at 1047)). As Defendant explains, however, even if the Court suppressed the evidence and dismissed the case, Defendant would not be freely released but rather would enter immigration custody pursuant to his immigration detainer. (Dkt. No. 38, at 8–9).

The Government also contends that suppression is improper, because "suppressing his identity would have little deterrent effect." (Dkt. No. 36, at 11 (quoting *United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005)))). Defendant does not respond to this argument. (*See generally* Dkt. No. 38). In *Navarro-Diaz*, the defendant was also charged under § 1326 and sought suppression of his identity because the information was allegedly obtained in violation of his Fourth Amendment rights. 420 F.3d at 582, 584. The Sixth Circuit held that suppression was improper, because the police likely had reasonable suspicion to detain him and "he was not accosted by the police in a random attempt to determine whether he was an illegal alien." *Id.* at 587. Moreover, the court noted that granting the suppression motion "would not affect the ultimate outcome of the charge" because "[i]f the government were forced to drop its prosecution of [defendant], the police could simply approach him on his way out of the courtroom door and demand that he identify himself." *Id.* at 588 (citing *Hiibel v. Sixth Judicial Dist.*, 542 U.S. 177 (2004)). As in *Navarro-Diaz*, the police could do the same here and if Defendant refused to answer, he could be arrested under a "state 'stop-and-identify' statute, and his identity could then be discovered during the course of the normal booking procedure." *Id.* Because Defendant could "simply be reindicted for the same offense, suppressing his identity would have little deterrent effect" upon the agents who seized him. *See id.*; *see also United States v. Ortiz-Hernandez*, 427 F.3d 567, 579 (9th Cir. 2005) ("If the government were forced to release [defendant] because the first set of fingerprint exemplars is suppressed, it would immediately have the authority to re-arrest and fingerprint him again in order to obtain the second set of fingerprint exemplars sought here for use in the new [illegal reentry] charge against [defendant]. No interest would be served, or fundamental right protected, by requiring the government to do this."); *United States v. Sandoval-Vasquez*, 519 F. Supp. 2d 198, 201 (D. Mass. 2007) ("[I]f the court were to suppress

all evidence of [defendant's] identity . . . [he could be] rearrested by immigration authorities . . . [and] photographed and fingerprinted without any hint of unlawfulness. Empty gestures do not further the primary purpose of the exclusionary rule, which is not to confer personal rights on criminal defendants, but to deter unlawful government conduct." (citation omitted)). "Where suppression fails to yield appreciable deterrence, exclusion is clearly unwarranted," because "[r]eal deterrent value is a necessary condition for exclusion." *Davis v. United States*, 564 U.S. 229, 237 (2011) (quotation marks and citations omitted). Therefore, even though the facts in this case are not as benign as the ones in *Navarro-Diaz,* the Government has conceded that it will not use, in its case-in-chief, body cam footage of the seizure or the Defendant's statements and the Court finds that with respect to any remaining fruits of the seizure the lack of deterrent value renders the exclusionary rule inapplicable. Accordingly, Defendant's motion to suppress is denied.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to suppress (Dkt. No. 23) is **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>May 19, 2025</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge